Good morning, ladies and gentlemen. Our first case for this morning will be Calvin Whiting v. Wexford Health Sources. Mr. Gold. Good morning. Calvin Whiting enters the Shawnee Prison in Southern Illinois in July of 2010 to serve a sentence for violating probation because he was charged with and convicted of burglary. Do I actually have a random question about this? I understand that eventually he winds up under the care of the doctor at the University of Chicago getting palliative care. Is he still alive? Yes. It's amazing, but he's still alive. Still on the right plane. I guess that's what I'm just trying to make sure. Dr. Justin Klein, which I think we referred to in our papers. Yes, you did. All right. So then on October 25, 2010, the appendix to our opening brief at pages 46 through 44, you'll see what is noticed about him by some of the medical personnel at Shawnee, and that is that he has nodes, nodules, bumps all over his jaw to his first hairline, his left armpit, and his groin area. Now that's on October 25, 2010, and certainly those are symptoms of cancer. But you don't treat cancer with Motrin, which is a muscle relaxer, and you don't treat it with antibiotics. So then October 27, 2010, he sees for the first time Dr. Alfred David, a defendant in this case, who is the medical director for Wexford at the Shawnee prison and has been there for years. And the record is clear that Dr. David, knowing what the problem was when he noticed Galvin Whiting, ordered a subcutaneous biopsy. Now that's not a needle biopsy. That's when you cut into the local area of where it is that it's suspected. So actually I have two questions about Dr. David, and the second is for a later part of your argument. Are you – I don't quite follow your Monell claim here, whether you are saying that he was a final policymaker, and if so, how you can reconcile that with cases that suggest that that doesn't just mean you're the last person in the decision chain. You really have to be a policymaker for the organization. Well, he had the final policymaking decision in terms of what he could or could not order by himself. It's clear that he could order this biopsy by himself, and he chose not to. Well, but that – I guess I can see that as an element of the individual claim against him. But by your logic, every single doctor is a final policymaker for Monell purposes, and I just don't think that's consistent. I don't think that's the limitation of it, Your Honor. I think that if you look in this record, Dr. Larson – Dr. Larson was the regional director for Wexford. Certainly, if anyone, he had the policy, but I believe that so did Dr. David. And again, I think that's a question for the jury. So are you arguing that Wexford recognizes only two situations, an emergency on the one side and elective procedures on the other side? In this case or generally speaking? Generally speaking, I think when you take a look at the testimony of Dr. Larson, the regional director, and he concedes that it's a lot cheaper to give Motrin an antibiotic than it is to do a subcutaneous biopsy, which is clearly called for. I think the entire record suggests that that's a policy of Wexford. Okay, so as of October the 25th, Dr. David says, looks like there should be a biopsy, but then he goes to this second person, and the two of them turn into a collegial review process, and for some reason the biopsy doesn't happen until much later. Right. And of course, it's that approximately three-month period of time that my client said – Can you review for me the evidence in the record of Mr. Whiting's own experience? You know, to what extent is he saying, even though maybe these nodules are reducing in size, I'm still in pain? Is he saying that? Yes, I think we cite in our papers the specific – I have the cite here – where he himself, we quote – This is like a page 10 you're looking? Of our opening – Of your opening brief, yeah. Yeah, where he himself testifies or quotes what he's going through, and that's in the medical records. So even though – because your opponents are arguing that the antibiotics are causing these nodules and other masses to shrink a bit, and I guess you – do I understand your response to be, that may be so, but he's still in a lot of pain? Yeah. I mean, I need to understand. Yeah, they can argue, or some temporary relief, some nurse says that there's some temporary relief. Big deal. I mean, the guy – look, Dr. David knows that this guy should have a biopsy. I mean, it's clear. And he let some unknown doctor – there's two members of the collegial review committee. He – Well, I realize he's half of them, which makes a kind of funny committee, but it's – Yeah. Yeah. Well, I mean, what doesn't make sense is that they don't order the biopsy then. I mean, he knows – I mean – Well, your argument further, though, has to be that the delay of two to three months causes him needlessly to suffer pain. I understood your theory to be that if he had gotten the biopsy, they would have seen that it was a lymphoma, they would have started the chemotherapy, and the pain would have been addressed. That's clearly in the record, Jessica. That's – okay. And that's what your theory is. Because Justin Klein, his oncologist, when he gets back to the city of Chicago, his deposition is taken and he signs an affidavit to that effect. He's not giving an opinion. The fact is that chemotherapy stops pain once it's commenced. That's a medical fact. Or at the very least, there's evidence in the record. I mean – I can tell you that that is a fact, and it's a medical fact. And to delay that period of time, to give this patient or inmate a biopsy so they could start – justify starting chemotherapy, because chemotherapy itself is expensive. And it makes no sense, as I read this record, and it's – The problem, counsel, the problem I see with your claim is that the deliberative difference standard requires more than just a mistake in medical judgment. True. It requires essentially the lack of medical judgment. And there was a medical judgment made here by this collegial review committee of two, including Dr. David, the defendant. And they reached a judgment that this should be treated as an infection initially and to continue and alter the antibiotic regimen. And so it's clear that medical judgment was exercised. It may have been mistaken. It clearly was mistaken. But that's not the standard. No, but it's – this is not a medical malpractice case. That's the point I'm making. Yes, I know, I understand that, Judge. It's not a medical malpractice case, but when you combine all the evidence in this case that's in this record now, it seems to us that it's a jury question as to whether or not that constitutes deliberate indifference. Let them argue, well, it's a medical mistake, it's a question of judgment, typical defenses in certain situations, but not in this situation. And at least it's a jury question. The district court said it's impossible for a reasonable jury to come to the conclusion that the failure to give this or take this biopsy when it should have been done was deliberate indifference or just a medical mistake. It's not a – I mean, the argument to be made is it's not a medical mistake. You've got the guy down there who is the director, the medical director. The first thing that comes out of his thought the day that he sees my client is let's get this guy a biopsy. Two days later, with somebody else, some other doctor on the collegial review committee, it's not done. Can a jury decide that that's deliberate indifference and not negligence and not just a mistake when that jury hears that there's $137 million paid a year to Wexford to medically serve all these prisons in Chicago? Okay, you can stop. I think we have your point, and actually you have used your rebuttal time. Okay, well, thank you. Thank you very much. We first, I think, will hear from Ms. Tuescher. Good morning. Julie Tuescher on behalf of the defendant, Dr. David. The issue that's presented for this court this morning is whether Dr. David was deliberately indifferent to Kelvin Whiting's medical needs. Actually, Mr. Gold has rephrased that as whether there is enough evidence in the record to create a genuine issue of material fact on that point. I certainly wouldn't say on this record that he's entitled to judgment, but is there enough to put it into issue? This court has articulated the standard for deliberate indifference as a medical decision that is so far afield of the accepted practices as to suggest that the doctor was not exercising medical judgment. Correct, and here's my issue about that. If he had simply come in complaining that his ear hurt and maybe an area near his neck, maybe you would treat this as an ear infection and give him these various antibiotics. But I was stunned to think that nodules in both around the jaw and in the groin, your brief says nothing about these groin nodules. I just don't get how that is an ear infection. Maybe my biology is all off, but it seems wildly indifferent to me to say that you treat it as an ear infection even though you've got the groin nodules. Well, what we can go by is what the physicians in this case have testified to. Dr. David said, I see patients with symptoms like this consistently over the years. But there's other evidence in the record. And he said, of all the patients I've seen with these symptoms, this is the only patient I've ever seen with lymphoma. Dr. Klein, the oncologist at the University of Chicago, addressed this. And he said, you know, when you have patients who present with these symptoms, like a small, a slightly elevated temperature, an earache, a sore throat, and enlarged lymph glands, it is perfectly appropriate to try a couple of courses of antibiotics first to see if the patient responds to those antibiotics before referring. But what if the patient is continuously in pain? I mean, I think your theory, as I understand Wexford's theory in general, is that pain doesn't matter. You can persist in a course of treatment even though people are constantly in pain. Even if maybe some of these nodes are reducing in size, I understand that. I realize that's your evidence, and I have no reason to disbelieve it. But there's a lot of record about the pain. So he's not getting any treatment for his pain. No, that's not correct. Judge, he receives Motrin. Well, he's getting ineffective treatment. Look, here's page 8. All through October, November, October 30th, November 1st, November 7th, November 8th, November 9th, November 11th, November 29th. So if you're giving somebody Motrin and it's not doing anything, isn't there a point at which that just becomes reckless? An entire month goes on when we have testimony from him in the IDOC medical records that nothing they're doing is helping. The medical records also show that on November 3rd, he had no complaints. November 7th, no complaints. But what about all these other dates? I grant you that he complained intermittently of pain over the course of... Of huge pain, 9 out of a scale of 10. That's what doctors use, this 10-point thing. I'm in pain all the time. What's relevant? I mean, why should he keep complaining when he says, I'm in pain all the time? Well, he specifically asked on other dates if he is in pain. He denies it. During the course of this antibiotic therapy, the lymph nodes get smaller. My physician requested a biopsy on October 27th within days of first seeing this patient. Collegial review. He spoke with another physician. But this is a crazy collegial review procedure. Some other guy comes, sits down in the room, and Dr. David changes his mind? No. What happens is they discuss it. So is the other person more authoritative? They discuss the patient's condition. They come to an alternative care plan. They say, let's try doxycycline. The patient responded to the doxycycline. Not in the pain sense. He doesn't. Well, I think there are indications in the record that would dispute that. And there are indications that don't. So why isn't that a disputed issue of fact? The fact that he had intermittent pain isn't the issue. Intermittent, tremendous pain that's going untreated. The issue is whether Dr. David treated this patient with deliberate indifference. Correct. No, I totally agree with that. I agree with everything Dr. Seitz says. I do not dispute that this patient intermittently complained of pain and discomfort during this interval. By intermittent, you mean every day. No, I don't. The 30th, the 31st, the 1st, the 2nd, the 3rd, the 4th. He misses the 5th, the 6th, the 7th, the 8th, the 9th. He misses the 10th as well, the 11th. That sounds like every day to me. On some of those same days, he's telling them he's not having pain. He's reporting that his lymph nodes are getting smaller. Prospectively, these doctors are looking at a patient who has what looks like an infection. They treat him for the infection. Within a little more than 30 days, this man has three courses of antibiotics, a chest X-ray, abdominal X-rays. He's referred to a surgeon for a biopsy on two occasions. The second time, it's approved, and he goes out for the biopsy, and he's diagnosed with lymphoma. That all takes place within a little more than 30 days. That's not reckless disregard. It's not 30 days. He doesn't get the biopsy until December 21st. On December 2nd, Dr. David requests the second biopsy. The biopsy is performed on December 26th. The complaint against Dr. David is his delay in the request for the biopsy. Right, leaving him in pain, basically. From October 27th to December 2nd. Right, right. Meanwhile, giving Motrin to decrease the inflammation to help him with his pain. But he's telling that the record shows that the Motrin is not doing anything. Again, I would go back to, was he exercising medical judgment? Right, and so is it medical judgment to persist in an ineffective course of treatment? I think it's not an ineffective course of treatment. Prospectively. So it would not be medical judgment if that's what it were. You are saying that that's not what this record shows. No, I'm saying prospectively he exercised medical judgment based upon this patient's symptoms and, more importantly, his response to the treatment that was given to him. Okay.  Thank you. Ms. DeGrand. Good morning, Your Honors. Karen DeGrand for Wexford HealthSource, Inc. May it please the Court, Wexford adopts Dr. David's argument. If the Court agrees with the District Court that the record does not display an issue of fact on the matter of deliberate indifference, then the plaintiff's claim against Wexford necessarily fails. I think that overstates matters. There are some times, as our Thomas case reveals, that it would be inconsistent to hold the company here, Wexford, liable if there's no individual liability. In those cases, what you say is exactly correct. Certainly if there was not an objectively serious condition, then both the individual and the company are necessarily in the same position. On the deliberate indifference point, though, we have said otherwise because there may be no subjective awareness on the part of the individual, and yet there may be a policy. But I do think that my statement is true in this case, Your Honor, given the way that the plaintiff has framed the issue. The Monell claim in the District Court that the plaintiff presented was based on what the plaintiff referred to as a pattern of conduct and in response to Wexford's motion for summary judgment, the plaintiff listed a bunch of lawsuits and didn't really expound on what the theory was, but the plaintiff now has dropped that claim, so that claim is gone. Yeah, that's what I was trying to ask. They're not in the pattern theory anymore. I thought they were just on the final decision-maker theory. That is my understanding as well. But that argument, well, in fact, the waiver doctrine also dispenses with that argument because that theory was never presented to the District Court. So we could end the discussion there, but it also fails on the merits. The deposition testimony is unrefuted that Dr. David had no role in establishing Wexford's policies. Dr. David is a clinician. I think the court made that point when counsel stepped up before the court. But as to the process of approval for offsite care, there is not a bit of evidence that Dr. David had any involvement in that process. Can you clarify that process? I understand that the doctors can refer if it's an emergency and that they go through a more elaborate process if it's elective, but there's obviously something between emergency and elective, which would be non-emergent but necessary. I'm sorry, I didn't mean to interrupt. What does Wexford say about that situation? Wexford in that situation would conduct collegial review, which is essentially the onsite doctor. Two people. I'm sorry, two people talking about it? Correct, correct. It's in the nature of a second opinion. It's called collegial review aptly because it's a conversation between a discussion about the appropriate treatment between two physicians who are reviewing the care. So I don't see any issue with that as far as a link from being a participant in discussing a patient's care with establishing the policy for Wexford on how that process comes about. There's also a new variation in the reply brief on the plaintiff's policymaker argument, and this was not in the plaintiff's opening brief, but the plaintiff asserts that there's a frugality component to Dr. David's decision-making process or to his assessment, and there's absolutely no evidence in the record to support that. In fact, there's ample evidence to refute that. Okay. I think we understand the point. Thank you, Your Honors. I appreciate your time, and I request that the Court affirm the judgment entered on behalf of Wexford. All right. So they went over a little bit. I will give you, if you'll stick to one minute, Mr. Gold. Your Honors, this collegial review process in Wexford is, in our view, a bunch of nonsense. Why isn't it just like a second opinion? Yeah. But here you've got, Your Honor, Dr. David, who is right there, sees my client, says immediately, let's give this guy a biopsy, and we don't know how it is that you ask that he is overruled or whatever happens not to give this man the biopsy. Judge, I must direct this Court to its opinion in the Hayes v. Snyder. It's 546 F. 3rd 516 that this Court rendered back in 2000. Yeah, you discussed that in your brief. What's that? You discussed that in your brief. Yeah, and I think it's so right on, it's right on. Okay. And I think you all have what the issues are, you've got a handle on it, but if you have any questions, I'll be happy to answer. Apparently not. Thank you very much. Thanks to all counsel. We'll take the case under advisement.